**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 09a0195n.06

Filed: March 12, 2009

No. 08-1174

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**


ASSURANCE COMPANY OF AMERICA,

    Plaintiff-Appellee,

        v.

LAVDAS JEWELRY, LTD,

    Defendant-Appellant.

On Appeal from the United
States District Court for the
Eastern District of Michigan
at Detroit

_____/

**Before:**     **GUY and GRIFFIN, Circuit Judges; WATSON, District Judge.**[*]

    **RALPH B. GUY, Jr., Circuit Judge.**     This is a dispute over whether there is insurance coverage for a million dollar loss sustained by defendant Lavdas Jewelry, Ltd., as the result of an armed robbery. The district court entered summary judgment for plaintiff Assurance Company of America, finding the insurance policy terms were unambiguous and did not provide coverage for Lavdas. Finding that the terms are ambiguous, we vacate the judgment of the district court.

**I.**

---

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

Defendant Lavdas Jewelry operates three jewelry stores in the Detroit, Michigan, metropolitan area. The business is owned by Nicholas Lavdas, who was at his store located in Warren, Michigan, the evening it was robbed—January 30, 2006. That store is located in a one-story strip center shopping plaza, with parking areas in front and some additional parking behind the store.

The night of the robbery, the jewelry store had closed to the public at 7:00 p.m. All but two people had left the store by approximately 7:30; those remaining were Nicholas Lavdas and employee Kathy Beauvais. Just before she left, Lavdas had a brief conversation with Beauvais, who indicated she was going to spend the evening with her parents. Lavdas then went to his office to close the remaining open safe and prepare to leave, at which time he heard the store's back door close. Moments later, he heard a knock on that same door. Lavdas opened the door to find Beauvais being held by three gunmen wearing ski masks. The gunmen forced their way into the store, pushing or pulling Beauvais with them. They tied Lavdas's ankles and wrists, pushed him to the floor, and hit him with a gun, causing injuries to his head and face. Beauvais was also bound and hit with a gun. One or more of the gunmen went into Lavdas's office, where loose diamonds and other items were taken from the open safe and surrounding area. When the gunmen left the building, Lavdas pushed one of the alarm system's panic buttons and authorities arrived within minutes.

Lavdas insured his stores through plaintiff Assurance Co. of America. Using a form provided by plaintiff, Lavdas had completed a June 2005 application for insurance in which he provided information about many aspects of the business, including details of the alarm system.

The alarm system at the location of the robbery consisted of a motion detector used when no one is in the store, a surveillance system, and a hold-up alarm system consisting of 4 hold-up or panic buttons. Under "WARRANTIES FOR PROPERTY ON DESCRIBED PREMISES AT ALL TIMES WHEN YOU ARE CLOSED FOR BUSINESS," the application indicated that 99% of the value of the store's property was kept in locked safes or vaults. The answers given by Lavdas to the questions affected the policy premium, and the policy provided that the application was a part of the policy. If Lavdas gave false answers to the questions, the "policy [would] be null and void and there shall be no coverage." The policy also provided, under the contract's "Additional Conditions:"

> 2. . . . .
>
>> b.   Protective Safeguards
>>
>> You must maintain the protective safeguards stated by you to be in effect at a location when this coverage began.
>>
>> If you fail to keep the protective safeguards:
>>
>> (1)   In working condition at a location; and
>>
>> (2)   In operation when you are closed to business;
>>
>> coverage to which the protective safeguards apply is automatically suspended at that location. This suspension will last until the equipment or services are back in operation.

Lavdas made an insurance claim for over $1 million. Plaintiff denied the claim in a letter dated July 25, 2006, stating in part that

1.   Lavdas Jewelry, Ltd., has breached certain warranties and safeguard endorsements of the policy including the policy provision which provides in pertinent part as follows:

> E.      Additional Conditions
>
> 2. b.   Protective Safeguards
>
> Item (3) is hereby added:
>
> (3)  A minimum of 2 individuals, either employees, officers or owners must be on the premises at all times during business hours and when opening/closing for business.

The letter also informed Lavdas that plaintiff had commenced a declaratory judgment action in district court to "bring this matter to a just and prompt conclusion."

Several months into the litigation, Lavdas sought leave to file a counter-complaint asserting breach of the insurance contract. Leave was granted by the court despite plaintiff's objection (in a motion for reconsideration) that it had not received notice of the defendant's request. The parties filed cross-motions for summary judgment in September and October 2007. Plaintiff contended coverage was barred because two employees/officers/owners were not on the premises at the time of the loss, and because Lavdas failed to meet the alarm system requirements when the business was closed. Defendant asserted in its cross-motion that its alarm system *was* operational, but that in any event plaintiff had waived its reliance on the policy provision requiring that defendant keep its alarm system in operation "when [it is] closed to business." The district court held oral argument on the motions, and made its determinations on the record, as follows:

I find the policy to be unambiguous. The store was closing, because not all the safes were locked. It was in the process of closing, and there was only one person present.

I think Mr. Black's argument prevails. And for the reasons stated on the record, the Plaintiff's motion is granted. The Defendant's counterclaims thus become moot.

The district court entered a summary written order reflecting its decision, from which defendant took this timely appeal.

## II.

Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). We review the district court's interpretation of the insurance contract and its summary judgment determination *de novo*. *See Duane Mgmt. Co. v. Prudential Ins. Co.*, 29 F.3d 245, 248 (6th Cir. 1994). The parties agree that Michigan law governs the interpretation of the insurance policy at issue. *See Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003), *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001).

Defendant asserts two related claims on appeal. First, it asserts that the district court erred in determining that the endorsement language quoted above barred coverage when the jewelry store was not "closing for business," but had already closed for business more than half an hour earlier. It alternatively asserts that two people did remain on the premises at the time of the incident. Second, it asserts that the district court wrongly determined that if the business

had been closed, the alarm system's motion detector, rather than only cameras and panic buttons, had to be turned on.

Two terms require interpretation in the endorsement plaintiff expressly relied on in denying coverage to defendant—"premises" and "closing for business." Defendant has argued that, because Lavdas was in the store and Beauvais was in the parking lot, two persons were on the "premises."[1] The term "premises" is defined in the insurance contract as "the interior of that part of the building(s) which you occupy at the location(s) shown on the Declarations Page." The district court did not err in interpreting "premises" to mean the interior of the store.

"Closing for business," however, is neither defined in the policy nor in relevant Michigan case law. In making its determination, the district court considered the policy provision requiring two persons on the premises while the store is closing for business, and the provision requiring an operating alarm system when the store is closed for business. At the summary judgment argument, defendant pointed to a page of plaintiff's brief describing the store as "closed," which plaintiff stated was not its position. Plaintiff clarified that its position was that the store was "closing for business" when it was robbed.[2] Defendant asserted the store was already closed for business, and that the alarm system *was* "operational," as the panic buttons and surveillance system were in effect. Defendant pointed out that a person can't be in the

---

[1]Defendant has alternatively suggested that, if "premises" is to be interpreted as the interior, Ms. Beauvais was "on the premises" at the time of the loss, as she was pushed back into the store at the time of the robbery. This argument is not seriously pursued and lacks merit.

[2]Plaintiff highlights testimony of Lavdas in which he stated that he "was just closing the store" when the robbery occurred. Defendant's position is that this testimony does not conflict with its argument that the business had already been closed at the time of the robbery and Lavdas was preparing to leave the building.

building with the motion detector on, as any person's presence there would trigger the alarm, and that under plaintiff's reading of the policy, no one, regardless of the purpose of their presence on the premises (*e.g.*, to take inventory or to perform building maintenance) may be in the store if it is closed.[3]

Plaintiff does not dispute this point made by defendant—that under its reading, if people are in the store when it is closed, defendant cannot maintain insurance coverage. In fact, plaintiff's counsel stated at argument that "what you do is that you have to have two employees present at closing. You set the alarm and you walk out of the store. And if you do that, there's coverage."[4] In response, defendant's position about the policy was that

> there only have to be two people on the premises when – you are during business hours, which we all agree doesn't apply, and when the business, the "business" is opening and closing. Not the "premises."
>
> It doesn't say you have to have two people inside the premises any time you enter or exit the premises. It doesn't say that.
>
> That's what (plaintiff's counsel) Mr. Black – that's how Mr. Black wants this policy to read; that unless there are two people in the premises when the premises are being entered and exited, if you don't have that, then there's no coverage.

---

[3]Defendant argues such a reading would impose an "absurd and impossible condition on the policyholder," as it would forbid any activity whatsoever at the store after it is closed to customers, citing *Wembelton Development Co. v. Travelers Insurance Co.*, 206 N.W.2d 222, 225 (Mich. Ct. App. 1973). Defendant also argues on appeal that we may consider "the reasonable expectations of the insured," citing to *Vanguard Insurance Co. v. Clarke*, 475 N.W.2d 48, 52 (Mich. 1991), but the rule was overruled by *Wilkie v. Auto-Owners Insurance Co.*, 664 N.W.2d 776, 788 (Mich. 2003).

[4]Plaintiff cites to cases such as *H&S Pogue Co. v. Fidelity & Casualty Co. of New York*, 299 F. 243 (6th Cir. 1924), and *Boesky Brothers Twelfth Street Corp.* v. *U.S. Fidelity & Guaranty Co.*, 255 N.W. 307, 308 (Mich. 1934), where courts found no insurance coverage where sufficient employees or custodians were not "on duty," none of which is on point here.

But everything in this policy is written in relation to the operation of the business. And by their own admission, the business wasn't operating anymore. It was closed. It was 40 minutes or so after the end of the operations. Everybody had gone. Mr. Lavdas was doing some other things. But the business was closed.

You only have to have one person in that premises at that time.

And the alarm system, that could work with a person inside that premises, was operational. They knew that. They knew what this alarm system was.

Now, could they have written this in a more clear fashion? Sure.

But why should they penalize Mr. Lavdas, who suffered a significant loss here, because the drafters of this policy didn't make it as clear as they want it to be?

They want this policy to say your entire alarm system, every facet of your alarm system must be in operation at a certain time or you must have two people inside the building when the building is entered and exited.

Neither of those things are stated in this policy.

This argument was followed by the court's grant of summary judgment for plaintiff, finding the "store" was "closing" because not all of the safes were locked, and that only one person was on the premises in violation of insurance provisions.[5]

Under Michigan law, insurance contracts are enforced according to their unambiguous terms. *See Citizens Ins. Co. v. Pro-Seal Serv. Group, Inc.*, 730 N.W.2d 682, 685-86 (Mich. 2007) (citing *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 193-94 (Mich. 1999)). An insurance contract is clear and unambiguous if it, "however inartfully worded or

---

[5]The district court did not expressly base its decision on the provision concerning having the alarm system "[i]n operation when you are closed to business," but referenced the provision in conversation with counsel during oral argument. Defendant's claims on appeal address the provision, asserting that plaintiff has waived reliance on it as plaintiff did not invoke the provision either in denying the claim initially or in its complaint for declaratory judgment. We need not address this argument given our findings below.

clumsily arranged, fairly admits of but one interpretation." *Farm Bureau Mut. Ins. Co. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999). Ambiguity arises in an insurance contract when two terms irreconcilably conflict or "when its provisions are capable of conflicting interpretations." *Id*. "'If the language is ambiguous, longstanding principles of contract law require that the ambiguous provision be construed against the drafter. Applied in an insurance context, the drafter is always the insurer.'" *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 787 (Mich. 2003) (quoting *Singer v. Am. States Ins.*, 631 N.W.2d 34, 41 n.8 (Mich. Ct. App. 2002)).

We cannot find, as the district court did, the "closing for business" language so straightforward as to be unambiguous. Under our reading, a reasonable interpretation of the contract could lead to both the district court's determination that two people were required on the premises at the time of the loss, as well as a determination that two people were not required on the premises at the time of the loss, because business hours were over and the store was locked. Because the contract reasonably could be interpreted either way, we find the provision to be ambiguous, and **VACATE** the entry of summary judgment for the plaintiff and **REMAND** for further proceedings.

GRIFFIN, Circuit Judge, dissenting.

I respectfully dissent from the majority's holding that the policy language "closing for business" is ambiguous. This provision does not invite conflicting interpretations under the policy, nor is its meaning unfamiliar or uncommon in its contemporary usage. I also conclude that the policy does not provide coverage for the loss because defendant breached a warranty that was material to the risk assumed by plaintiff Assurance Company of America.

Pursuant to Michigan law, "the proper approach is to read the phrase as a whole, giving the phrase its commonly used meaning." *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 195 (Mich. 1999). "This approach is consistent with the parallel rule for statutory construction, which requires that all nontechnical words and phrases be defined according to the common and approved usage of the language." *Id.* "Insurance contracts and any coverage exclusions found therein are generally construed in favor of the insured, but only as a last resort; any ambiguous terms are given their plain and commonly understood meanings as much as possible, and an insurer cannot be held liable for risks it did not contract to assume." *Farm Bureau Gen. Ins. Co. of Mich. v. Duncan,* Nos. 2777531 & 277662, 2008 WL 3540203, at *1 (Mich. Ct. App. Aug. 14, 2008) (citing *Klapp v. United Ins. Group Agency Inc.*, 663 N.W.2d 447, 454-55 (Mich. 2003)).

The majority concludes that the phrase "closing for business" is ambiguous because it invites conflicting interpretations, to wit, that "two people were required on the premises at the time of the loss, and that two people were not required on the premises at the time of the loss because business hours were over and the store was locked." I disagree.

Section E.2.b.(3) appears under the "Protective Safeguards" section of the policy. That section requires that the insured take certain safety precautions at different times of the business day. Specifically, it mandates that at least two agents be on the insured's premises "at all times during business hours and when opening/closing for business." Therefore, whether employees are readying the store for customers in the morning, putting away jewelry in the evening, or conducting customer sales, two agents must be in the store. Different provisions of the policy apply, however, when the store is "closed for business," and they require that its alarm system be operational and all insured property be secured in locked safes or vaults.

Defendant Lavdas Jewelry, Ltd. argues on appeal that its coverage was not barred by operation of E.2.b.(3) because the store was not "closing for business," but was "closed for business." However, defendant's proposal for insurance belies this argument because defendant expressly warranted that when its store was "closed for business," 100 percent of its insured property was "kept in locked safes." As the majority correctly notes, each answer submitted by defendant in its proposal for insurance coverage "constitute[d] a warranty" because "[t]he pricing of the policy is based on the statements in [the insured's] proposal."[1]

---

[1] "In addition to explicit coverage provisions and exclusions . . . [jeweler's block] policies are usually issued based upon the insured's warranties or representations concerning the location of all or a percentage of the insured property in a safe or vault, or to the percentage or maximum value of inventory which may be displayed in the store windows." 11 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 154:67 (3d ed. 2008) (providing overview of relationship between warranties and representations in application for coverage in jeweler's block polices) (internal footnotes omitted).

In *Usher v. St. Paul Fire & Marine Ins. Co.*, 337 N.W.2d 351 (Mich. Ct. App. 1983),[2]

the Michigan Court of Appeals construed an identical warranty provision contained in a

jeweler's block policy:

> By the plain language of the policy and the incorporated application, plaintiff
> warranted that 100 percent of the stock would be kept in locked safes when the
> business was closed. In *Lehr v. Professional Underwriters*, 296 N.W. 843 (1941)
> quoted by *Scanlon v. Western Fire Ins. Co.*, 144 N.W.2d 677 (1966), the Supreme
> Court held that "[an] insurance company may limit the risks it assumes and fix its
> premiums accordingly. The liability was limited in the policy. To hold otherwise
> would be to write a new contract for the parties." Defendant insurer assumed the
> risk only for plaintiff's stock which was kept in locked safes when the business
> was closed. It is undisputed that the only jewelry taken during the burglary was
> that contained in display cases outside of the safes. The breach of the warranty
> was material to the risk assumed by defendant. The lower court properly granted
> summary judgment in favor of defendant on this ground . . . .

*Id.* at 352.

In the present case, the policy instructs defendant that "when [it] [is] closed for

business," the "minimum percentage by value of property kept in locked safes or vaults . . . is

99%" and the "minimum percentage of value of property kept in other locked safes or vaults

. . . is 1%." Thus, defendant expressly warranted that when it was "closed for business," 100

percent of the insured property would be kept in locked safes or vaults. It is uncontested by the

parties that the insured property was stolen from an unlocked safe in Mr. Lavdas's office. Thus,

---

[2]When interpreting questions of state law, "a state's intermediate appellate court decisions
are the best authority in the absence of any supreme court precedent . . . ." *United States v. Simpson*,
520 F.3d 531, 536 (6th Cir. 2008).

even if the store was "closed for business" as defendant contends, and assuming arguendo that

its alarm system was fully operational, the policy still precludes coverage for defendant's loss.[3]

I agree with the majority opinion insofar as it concludes that the policy does not specify

whether more than one agent is required on the premises when the store is "closed for business,"

i.e., when business hours are over and the store is locked. However, this omission, standing

alone, does not render the policy's terms ambiguous. The policy's requirement that all insured

jewelry must be contained in locked safes when the store is closed would render the policy's

security provision requiring the presence of two agents unnecessary. In short, there is a

decreased risk of loss when the insured property is under lock and key. Moreover, a contrary

interpretation, such as the one advanced by defendant, would hold plaintiff liable for risks that

it did not contract to assume.

Defendant contends that an interpretation of the policy that requires the presence of two

agents in the store at all times to maintain coverage would produce an absurd result. However,

jeweler's block insurance differs from most other traditional forms of property insurance. *See*

11 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 154:67 (3d ed. 2008). Under a

typical property insurance contract, called a "named peril" policy, an insurer agrees to

indemnify its insured for losses resulting from certain risks of loss or damage which are

specifically enumerated within the provisions of the policy. *Id.* In contrast, under a jeweler's

block policy, which is an "all-risks" policy, *any* loss or damage to jewelry can be insured,

---

[3] This court "may affirm on any grounds supported by the record even if different from the reasons of the district court." *Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) (citation omitted).

subject to certain exceptions. *Id.* Thus, requiring the presence of two agents as a security precaution when, for example, one million dollars worth of loose diamonds is kept in an open safe, does not yield an absurd result in light of the "all-risks" coverage provided by plaintiff. *Id.*

Next, although Michigan courts have yet to interpret the phrase "closing for business," a lack of precedent on this point does not remove this phrase from its contemporary usage. The phrase "closing for business" implies an active process, namely, the tasks performed by employees after normal business hours are over but before the store is vacated for the evening. Defendant's manager, Cynthia Lowe, testified that defendant had a set procedure for closing the store, which involved, among other things, placing the jewelry in the safes, locking the safes, "double-checking everything," mak[ing] sure that everything was locked," setting the alarms, and "all walk[ing] out together." Defendant's owner also testified that he was "closing the store" at the time of the robbery.

Title 12, Section 568.3 of the Code of Federal Regulations was promulgated pursuant to the Bank Protection Act of 1968, 12 U.S.C. § 1881-84 (1988). The Bank Protection Act requires the Office of Thrift Supervision (a branch of the Department of the Treasury) to establish minimum safety standards for banks and savings and loan institutions. Specifically, it "requires each savings association to adopt appropriate security procedures to discourage robberies, burglaries, and larcenies and to assist in the identification and prosecution of persons who commit such acts." 12 C.F.R. § 568.1(a). Section 568.3 requires, among other things, that

each bank "[e]stablish procedures for *opening and closing for business* and for the safekeeping of all currency, negotiable securities, and similar valuables at all times." *Id.* (emphasis added).

Although the BPA does not define "opening and closing for business," its use of that phrase alongside the word "safekeeping" demonstrates the federal government's acknowledgment of the particular vulnerability of banks during this time period. The BPA thus provides persuasive authority that businesses dealing in valuables should be taking the necessary precautions to safeguard such property when they are "opening and closing for business." Because Mr. Lavdas was alone and still "in the process of closing" the store when the loss occurred, defendant did not take the required precautions to secure its jewelry from loss, and its coverage is therefore barred under section E.2.b.(3) of the policy.

For these reasons, I would affirm the judgment of the district court.